IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| ARVEST BANK, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 10-2004 |
| ) | |
| PRESTON E. BYRD, DONETTE L. ) | |
| BYRD, and PRESTON E. BYRD ) | |
| IRREVOCABLE INSURANCE TRUST, ) | |
| ) | |
| Defendants. ) | |

ORDER ON SUMMARY JUDGMENT MOTIONS

Before the Court is the September 8, 2010 Motion for
Summary Judgment Against Defendant Preston E. Byrd for
Conversion and Fraud in the Inducement and Motion for Summary
Judgment on Defendant Byrd's Counterclaim filed by Plaintiff
Arvest Bank ("Arvest").  (Pl. Arvest Bank's Mot. for Summ. J.
Against Def. Preston E. Byrd for Conversion and Fraud in the
Inducement and Mot. for Summ. J. on Def. Byrd's Countercl., ECF
No. 41.)  ("Arvest's Mots.")  Defendant Preston E. Byrd
("Preston Byrd") responded in opposition on January 24, 2011.
(Def. Preston E. Byrd's Resp. in Opp'n to Arvest Bank's Mot. for
Summ. J. for Conversion and Fraud in the Inducement and in Supp.
of Def. Byrd's Mot. for Summ. J. Against the Pl. Arvest Bank,
ECF No. 59.)  ("Byrd's Resp.")  Arvest replied on February 4,

2011.  (Pl. Arvest Bank's Reply Mem. in Supp. of Mot. for Summ.
J. Against Def. Preston E. Byrd, ECF No. 63.)  ("Arvest's
Reply")

     Also before the Court is the March 18, 2011 Second Motion
for Summary Judgment Against Plaintiff Arvest Bank and in
Opposition to Arvest Bank's Motion for Summary Judgment Against
Defendant Preston E. Byrd for Conversion and Fraud in the
Inducement filed by Defendants Preston Byrd and Donette L. Byrd
("Donette Byrd").  (Defs.' Preston E. Byrd and Donette L. Byrd
Second Mot. for Summ. J. Against Pl. Arvest Bank and in Opp'n to
Arvest Bank's Mot. for Summ. J. Against Def. Preston E. Byrd for
Conversion and Fraud in the Inducement, ECF No. 66.)  ("Byrds'
Mot.")  Arvest responded in opposition on March 31, 2011.  (Pl.
Arvest Bank's Resp. in Opp'n to Defs.' Second Mot. for Summ. J.
and Separate Statement of Material Facts, ECF No. 67.)
("Arvest's Resp.")  Preston Byrd and Donette Byrd replied on
April 19, 2011.  (Defs. Preston E. Byrd and Donette L. Byrd's
Reply Mem. in Supp. of Their Second Mot. for Summ. J. Against
Arvest Bank, ECF No. 68-3.)

     For the following reasons, Arvest's motion for summary
judgment against Preston Byrd for conversion and fraud in the
inducement is DENIED.  Arvest's motion for summary judgment on
Preston Byrd's counterclaims is GRANTED.  Preston Byrd and
Donette Byrd's motion for summary judgment is DENIED.

                                2

## I.    Background[1]

According to Arvest, in 2006 and 2007, Horizon Holding Company, LLC ("Horizon Holding") sought financing for the acquisition and construction of a multifamily low and moderate income housing facility to be known as the Lamar Crossing Apartments project (the "Lamar Crossing project").    (See Pl. Arvest Bank's Separate Statement of Material Facts in Supp. of Mot. for Summ. J. Against Def. Preston E. Byrd for Conversion and Fraud in the Inducement, in Opp'n to Defs.' Mot. for Summ. J. and in Supp. of Mot. for Summ. J. on Def. Byrd's Countercl. ¶ 1, ECF No. 41-2.)   ("Arvest's Statement of Facts")  The Lamar Crossing project transaction required the issuance of $8,100,000 in Multifamily Housing Revenue Bonds by the Health, Educational and Housing Facility Board of the City of Memphis to finance the renovation, construction, and improvement of the Lamar Crossing project.    (See id. ¶ 13.)   Arvest was the primary lender and purchaser of the Lamar Crossing project bonds: it invested $8,219,576.81 in the Lamar Crossing project and owns all of the Lamar Crossing project bonds.    (See id. ¶ 14.)

Preston Byrd served as agent and chief manager for Horizon Holding in the Lamar Crossing project.    (See id. ¶ 2.)   Preston

---

[1] The parties dispute many facts and present very different accounts of the facts underlying the litigation that are relevant to the motions before the Court.    For ease of reference, the Court will first summarize the evidence Arvest presents that is relevant to the motions before the Court and then summarize the evidence Preston Byrd presents.

Byrd represented to Arvest and other entities involved in the Lamar Crossing project transaction that his only role was as chief manager and that Orson Sykes ("Sykes") and James Hutton ("Hutton") were the sole members and owners of Horizon Holding. (See id. ¶¶ 3, 6-7.) After conducting credit and background investigations of Sykes and Hutton, Arvest agreed to proceed with the transaction. (See id. ¶ 4.) Because Preston Byrd represented that he was not a member or owner of Horizon Holding, Arvest did not investigate his background, credit, and finances. (See id. ¶ 5.) Arvest proceeded with the transaction without knowing that Preston Byrd is a convicted felon, having pled guilty to wire fraud in the United States District Court for the District of North Dakota in 2003. (See id.)

Despite Preston Byrd's representations, Sykes and Hutton were not the only members and owners of Horizon Holding in June 2007. (See id. ¶ 37.) Pursuant to a March 17, 2006 Membership Interest Transfer Agreement, Sykes had transferred an 80.05% majority membership interest in Horizon Holding to Horizon Financial Group, LLC ("Horizon Financial"). (See id.) Sykes retained a 19.95% membership interest in Horizon Holding. (See id.) Preston Byrd was initially the majority owner of Horizon Financial. (See id. ¶ 38.) On January 5, 2006, Preston Byrd transferred his majority interest in Horizon Financial to Donette Byrd for no consideration. (See id.) Because of the

4

membership interest transfers in 2006, Donette Byrd was the
undisclosed majority owner of Horizon Holding. (See id. ¶ 39.)
Preston Byrd and Donette Byrd never disclosed to Arvest or any
other entity in the Lamar Crossing project transaction that
Donette Byrd was Horizon Holding's true majority owner. (See
id. ¶ 40.)    Because of Preston Byrd's recent conviction and
sentence for a crime involving dishonesty and fraudulent
activity, Arvest would not have agreed to participate in,
finance, and purchase the bonds for the Lamar Crossing project
transaction if Donette Byrd's secret majority interest in
Horizon Holding had been disclosed to Arvest. (See id. ¶ 41.)

Arvest required individual guarantees from the members and
owners of Horizon Holding to proceed with the transaction. (See
id. ¶ 10.)    Sykes and Hutton entered into a Guaranty and
Suretyship Agreement, guaranteeing the indebtedness of Lessee
Lamar Crossing Apartments, LP ("Lessee") under the lease
documents and all other amounts due or to become due under the
lease agreement and other lease documents. (See id. ¶ 8.)
Sykes and Hutton also entered into a Guaranty of Completion
Agreement, guaranteeing the full and complete construction of
the property improvements, payment of development costs, and all
costs and expenses of the significant bondholder in enforcing
the Lessee's obligation to complete construction of the property
improvements. (See id. ¶ 9.)    If Arvest had known that Donette

Byrd was a member and owner of Horizon Holding, she would have been required to guarantee the transaction as well. (See id. ¶ 41.) Arvest and other entities would have conducted a background investigation and performed due diligence of Preston Byrd and Donette Byrd and, on discovering Preston Byrd's felony conviction for wire fraud, Arvest would not have gone forward with the transaction. (See id.)

As part of the Lamar Crossing project transaction, Lessee, Horizon Holding, The Bank of New York Trust Company, N.A. as trustee ("BNYM"), Investor Limited Partner Boston Capital Corporate Tax Credit Fund XXVI ("Boston Capital"), and Arvest entered into a disbursement agreement on June 1, 2007. (See id. ¶ 15.) Preston Byrd signed the disbursement agreement on behalf of Lessee and Horizon Holding. (See id.) The disbursement agreement established the disbursement procedure for the financing provided by Arvest and Boston Capital for the Lamar Crossing project. (See id. ¶ 16.) Lessee was required to submit construction reports and other documentation and receive Arvest's approval on draw requests before submitting draw requests to trustee BNYM. (See id.) When trustee BNYM received Arvest's approval of a draw request, BNYM was to pay the contractor and subcontractors the amount approved in the draw from the construction funds. (See id. ¶ 17.)

6

The Lamar Crossing project transaction closed on June 14, 2007, and construction began. (See id. ¶ 18.) After the transaction closed, Arvest continued to require updated financial statements and tax returns from corporate guarantor Horizon Holding and individual guarantors Sykes and Hutton. (See id. ¶ 19.) On December 27, 2007, Preston Byrd provided a copy of Horizon Holding's 2006 United States Return of Partnership Income to Arvest. (See id.) As part of the tax return, Preston Byrd attached the Schedule K-1 forms for Sykes and Hutton, which showed that Horizon Holding reported to the Internal Revenue Service that Sykes owned 87% of Horizon Holding and Hutton owned 13% of Horizon Holding. (See id.)

Between August 2007 and March 2007, Preston Byrd submitted requisition requests to Arvest on behalf of Lessee listing vendors to whom payment was due, descriptions of expenses, and amounts owed. (See id. ¶ 20.) Arvest reviewed and approved the requisition requests, and Lessee submitted them to trustee BNYM. (See id.) Instead of paying general contractor Patton & Taylor Enterprises, LLC ("Patton Taylor") and other vendors directly as required under the disbursement agreement, trustee BNYM erroneously paid Lessee directly for the requisition requests, and Preston Byrd received wire transfers from BNYM of $5,553,749.06. (See id. ¶ 21.) Preston Byrd did not forward the proceeds to Patton Taylor and other vendors. (See id. ¶

22.) Lessee and Preston Byrd kept the money and delayed paying vendors until they had received funds from subsequent requisitions. (See id.)

From September 2007 to May 2008, Preston Byrd transferred and diverted $1,280,000 in proceeds from the requisitions BNYM had erroneously paid to one of Horizon Holding's accounts with Bank of America that Preston Byrd controlled. (See id. ¶¶ 23-24.) Preston Byrd commingled the diverted funds in Horizon Holding's bank account and used them for personal use, such as paying himself at least $158,000 over eight months, paying off numerous personal expenses, paying state and federal taxes, making loans to various individuals, and transferring funds to unrelated business ventures in which Preston Byrd was involved. (See id. ¶¶ 24-26.) While Preston Byrd was diverting construction funds from Lamar Crossing to Horizon Holding, he had Horizon Holding pay $228,644.48 in charges for an individual American Express card in Sykes' name. (See id. ¶ 27.)

On April 16, 2008, general contractor Patton Taylor stopped work on the Lamar Crossing project for nonpayment of a requisition. (See id. ¶ 28.) On April 29, 2008, Preston Byrd opened an individual account with Interactive Brokers, LLC ("Interactive Brokers"). (See id. ¶ 29.) Preston Byrd had Horizon Holding wire transfer $10,000 and $90,000 to the Interactive Brokers account in his name. (See id.) The funds

8

for those wire transfers came from wire transfers the same day or preceding day from Lessee to Horizon Holding. (See id.) Preston Byrd proceeded to make speculative options and futures trading investments with the money, losing over $50,000 in the first month. (See id.) Preston Byrd eventually lost nearly all of the money and closed the account. (See id.)

While Preston Byrd was diverting construction proceeds from the Lamar Crossing project, he transferred significant assets of Horizon Holding to Donette Byrd for no consideration. (See id. ¶ 42.) On December 27, 2007, Preston Byrd transferred company real estate in Collierville, Tennessee, to Defendant Preston E. Byrd Irrevocable Insurance Trust ("Byrd Trust") for no consideration. (See id.) The Byrd Trust transferred the same real estate to Donette Byrd for no consideration on March 25, 2009. (See id.) At the time, the real estate had a stated value of $472,000. (See id.) On April 1, 2008, Preston Byrd transferred three company cars to Donette Byrd, including two Mercedes-Benz cars and one Honda CRV, for no consideration. (See id.)

On May 2, 2008, a check Preston Byrd had signed on behalf of Lessee in the amount of $1,153,000 payable to general contractor Patton Taylor for attempted payment of a requisition request was returned for unavailable funds. (See id. ¶ 31.) On May 7, 2008, Patton Taylor gave written notice that it was

terminating the construction contract for nonpayment of its requisition request and another draw request. (See id. ¶ 32.) Patton Taylor filed a lien on the Lamar Crossing project for the amounts owed by Lessee. (See id. ¶ 34.)

Construction on the Lamar Crossing project was not completed and remains incomplete. (See id. ¶ 43.) Arvest, through its successor trustee, foreclosed on the Lamar Crossing real property. (See id. ¶ 44.) After acquiring the property for its appraised value at the foreclosure sale, a deficiency remained on the Lamar Crossing project debt. (See id. ¶¶ 46-47.) As of September 16, 2009, Arvest was owed $3,291,206.13 as a deficiency on the loan for the Lamar Crossing project transaction, with daily interest of $554.55 accruing on the underlying debt since that date. (See id. ¶ 47.) As of August 31, 2010, Arvest had incurred $734,117.81 in expenses to preserve and maintain the real property. (See id. ¶ 48.) Arvest contends that the total amount owed by Preston Byrd in damages for wrongful conversion of construction funds is $4,025,323.94, with daily interest of $554.55 accruing since September 16, 2009. (See id. ¶ 49.)

Preston Byrd, acting pro se, presents a very different account of what happened. Preston Byrd states in an affidavit that Arvest performed a background investigation on him and discovered his felony conviction before proceeding with the

10

Lamar Crossing project transaction.  (Aff. of Preston E. Byrd ¶ 11, ECF No. 59-1.)  According to Preston Byrd, he discussed his felony conviction with Clarence Beatty ("Beatty"), an Arvest employee, and Arvest agreed to proceed with the loan with only Sykes, Hutton, and Horizon Holding as guarantors of the loan.  (See id.)  Preston Byrd also states:

> Arvest was fully aware of Byrd's involvement and his role in the Lamar Crossing project.  It was never hidden to Arvest that Byrd served as the Chief Manager to [Horizon Holding] and that Byrd would be executing all of the documents related to Lamar Crossing on the behalf of [Horizon Holding] as its Chief Manager.  It was also never hidden to Arvest that Byrd was very active and played a major role in pulling the Lamar Crossing transaction together.  Arvest has admitted that it was aware of Byrd's involvement in the project and that Byrd [] executed several project related documents as the Chief Manager of [Horizon Holding].
>
> Arvest was fully aware of Byrd's felony conviction because Arvest preformed [sic] a background check on Byrd after Byrd submitted the Business Identification Notice to Arvest and after a verbal discussion that Byrd had with Beatty however, Arvest chose to continue with the [commencement] of the loan for [Lamar Crossing Apartments, LP] in spite of Byrd's previous history.

(Id. ¶¶ 12-13.)  In response to Arvest's allegation that he transferred and diverted $1,280,000 in proceeds from requisitions, Preston Byrd states:

> Arvest alleges that Byrd transferred and diverted $1,280,000 in proceeds received from Requisitions No. 2, 3 and 5-10 from Lessee to a bank account of [Horizon Holding] with Bank of America, which bank account Byrd controlled.  However, [Lamar Crossing Development, LLC] was a vender to [Lamar Crossing Apartments, LP] and [Horizon Holding] was the sole

> owner of [Lamar Crossing Development, LLC]. [Lamar Crossing Development, LLC] was contracted by [Lamar Crossing Apartments, LP] to perform development services for a fee in the amount of $1,365,000. Any fees that were received by [Horizon Holding] from [Lamar Crossing Apartments, LP], in which Byrd denies that funds in the amount of $1,280,000 were received by [Horizon Holding], were for services rendered under the terms of the Development Agreement.

(Id. ¶ 38 (internal citation omitted).)

Arvest filed a complaint against Preston Byrd, Donette Byrd, and the Byrd Trust (collectively, "Defendants") on January 5, 2010. (Compl., ECF No. 1.) Arvest filed an amended complaint on April 1, 2010, (Am. Compl., ECF No. 11), and a second amended complaint on June 3, 2010, (Second Am. Compl., ECF No. 24). In the second amended complaint, Arvest alleges that Defendants are liable for (1) conversion, (2) money had and received, unjust enrichment, and restitution, (3) fraud, (4) fraudulent conveyance,[2] and (5) common law fraud in the inducement and intentional misrepresentation.[3] (See id. ¶¶ 34-45, 49-73.) Preston Byrd filed counterclaims against Arvest Bank "for negligence, tort, libel, slander, irreparable injury, compensatory damages, and punitive damages." (Def. Counter-Claim Against Arvest Bank 1, ECF No. 35.)

## II.  Jurisdiction and Choice of Law

---

[2] Arvest's fraudulent conveyance count appears to be directed against Preston Byrd, not Donette Byrd or the Byrd Trust. (See Second Am. Compl. ¶¶ 49-55.)
[3] Arvest also included a separate count asking the Court to impose a constructive trust on monies and property in Preston Byrd's possession. (See Second Am. Compl. ¶¶ 46-48.)

## A.   Jurisdiction

Although  Defendants  have  not  presented  jurisdictional arguments  in  opposition  to  Arvest's  summary  judgment  motions, they  argued  that  the  Court  lacked  jurisdiction  over  Arvest's original  and  first  amended  complaint  in  prior  motions  that  the Court  denied  as  moot  because  Arvest  subsequently  filed  amended complaints.   (See  Mot.  to  Dismiss  for  Lack  of  Subject-Matter Jurisdiction,  ECF  No.  6;  Mot.  to  Dismiss  Am.  Compl.  for  Lack  of Subject-Matter  Jurisdiction,  ECF  No.  17;  Order  Denying  as  Moot Defs.'  First  and  Second  Mots.  to  Dismiss,  ECF  No.  39;  Order Denying  as  Moot  Defs.'  Third  Mot.  to  Dismiss,  ECF  No.  54.) Defendants  argued  that  Arvest  had  not  established  the citizenship  of  the  Byrd  Trust  or  satisfied  the  amount-in-controversy  requirement.   (See  Mot.  to  Dismiss  for  Lack  of Subject-Matter  Jurisdiction  1-2;  Mot.  to  Dismiss  Am.  Compl.  for Lack  of  Subject-Matter  Jurisdiction  1-3.)   Because  the  Second Amended  Complaint  contains  very  similar  factual  allegations  to prior  complaints  and  "[s]ubject  matter  jurisdiction  is  a  federal court's  'power  to  adjudicate  a  case,'"  Limbright  v.  Hofmeister, 566  F.3d  672,  675  (6th  Cir.  2009)  (citing  United  States  v. Martin,  526  F.3d  926,  933  (6th  Cir.  2008)),  the  Court  will consider  Defendants'  arguments  in  deciding  whether  it  has jurisdiction.

Under 28 U.S.C. § 1332(a)(1), the Court has "original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs" between citizens of different states. 28 U.S.C. § 1332(a)(1). "The party invoking federal court jurisdiction . . . has the burden of demonstrating by competent proof that the complete-diversity and amount-in-controversy requirements are met." Cleveland Hous. Renewal Project v. Deutsche Bank Trust Co., 621 F.3d 554, 559 (6th Cir. 2010) (citing Hertz Corp. v. Friend, 130 S. Ct. 1181, 1194-95 (2010)); see also 15 James William Moore, Moore's Federal Practice § 102.14, at 102-32 (3d ed. 2010) ("Thus, the party seeking to invoke jurisdiction under Section 1332 bears the burden of proving that complete diversity existed at the time the action was filed.") (internal citation omitted).

"Diversity of citizenship . . . exists only when no plaintiff and no defendant are citizens of the same state." Curry v. U.S. Bulk Transp., Inc., 462 F.3d 536, 540 (6th Cir. 2006) (quoting Jerome-Duncan, Inc. v. Auto-By-Tel, L.L.C., 176 F.3d 904, 907 (6th Cir. 1999)). Although "[t]he general rule is that diversity is determined at the time of the filing of a lawsuit," id., "an amended complaint supercedes all prior complaints," Drake v. City of Detroit, 266 F. App'x 444, 448 (6th Cir. 2008). "[W]hen a plaintiff files a complaint in

14

federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction." Rockwell Int'l Corp. v. United States, 549 U.S. 457, 473-74 (2007) (citations omitted); see also Curry, 462 F.3d at 540 ("[P]ersuasive authority counsels that in a situation such as this where an amended complaint is filed to include the identity of a previous unidentified defendant, diversity must be determined at the time of the filing of the amended complaint."). Therefore, the Court will look to the Second Amended Complaint to determine whether it has jurisdiction.

Arvest is an Arkansas corporation with its principal place of business in Arkansas.[4]  (See Second Am. Compl. ¶ 2; Def. Counter-Claim Against Arvest Bank ¶ 3; Answer of Arvest Bank to Countercl. ¶ 3, ECF No. 38.)  Preston Byrd and Donette Byrd are

---

[4] The Court takes judicial notice that Arvest is listed on the Arkansas Secretary of State's website as an Arkansas bank with its principal address in Arkansas.  See Arkansas Secretary of State, http://www.sos.arkansas.gov/corps/search_corps.php?DETAIL=62411&corp_type_id= &corp_name=arvest+bank&agent_search=&agent_city=&agent_state=&filing_number=& cmd= (last visited August 3, 2011); see also Pettett Funeral Home, Ltd. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., No. 10-1000-GPM, 2010 WL 5463243, at *1 (S.D. Ill. Dec. 29, 2010) ("Turning then to the matter of minimal diversity of citizenship, the Court can judicially notice the records of corporations maintained online by the Illinois Secretary of State . . . .") (citations omitted); East Bay Mun. Util. Dist. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, No. C 09-0614 PJH, 2009 WL 975442, at *5 n.3 (N.D. Cal. Apr. 10, 2009) (taking judicial notice of the results of a search of the California Secretary of State's website); Corsmeier Indus., Inc. v. Pearl Abrasive Co., No. 1:08-cv-285, 2008 WL 3200650, at *1 (S.D. Ohio Aug. 6, 2008) (taking judicial notice that a company was registered as a domestic limited liability company on the Ohio Secretary of State's website in evaluating whether the court had diversity jurisdiction); United States ex rel. Dingle v. BioPort Corp., 270 F. Supp. 2d 968, 972 (W.D. Mich. 2003) ("Public records and government documents are generally considered 'not to be subject to reasonable dispute.'  This includes public records and government documents available from reliable sources on the Internet.") (citation omitted).

Tennessee citizens.  (See Second Am. Compl. ¶¶ 3-4; Defs. Answer to Second Am. Compl. ¶¶ 3-4, ECF No. 28.)  Arvest alleges that the Byrd Trust "is a trust controlled by [Preston Byrd].  The trustee of the Byrd Trust is Preston E. Byrd, a resident citizen of the State of Tennessee."  (See Second Am. Compl. ¶ 5.) Preston Byrd denied those allegations.  (See Defs. Answer to Second Am. Compl. ¶ 5.)

Arvest filed the Second Amended Complaint on June 3, 2010. (See Second Am. Compl. 14.)  In a signed letter dated March 30, 2009, Preston Byrd instructed Terry L. Spicer ("Spicer") that "I am hereby exercising my right to remove you as acting Trustee of the Trust effective immediately" although the Byrd Trust is purportedly an irrevocable trust.  (Ex. A, ECF No. 20-1.) Preston Byrd instructed Spicer, "Please forward any trust assets, documentation or information which you have in your possession to the address above," 1359 Colbert Cove, Collierville, Tennessee 38017. (Id.)  On March 25, 2009, Spicer had transferred on behalf of the Byrd Trust the real property at that address for $10 and other consideration to Donette Byrd, who resided at that address.  (See Aff. of David M. Rudolph 5-6, ECF No. 8-1.)  On April 26, 2010, Preston Byrd signed a consent order on behalf of the Byrd Trust in another case.  (See Ex. B, at 2-4, ECF No. 20-2.)  Therefore, Arvest has demonstrated by

competent proof that Preston Byrd controls the Byrd Trust and was its trustee when the Second Amended Complaint was filed.

"[F]or diversity purposes a trust is a citizen of whatever state the trustee is a citizen of." May Dep't Stores Co. v. Fed. Ins. Co., 305 F.3d 597, 599 (7th Cir. 2002) (citations omitted); accord Homfeld II, L.L.C. v. Comair Holdings, Inc., 53 F. App'x 731, 732 (6th Cir. 2002) (citations omitted); Gen. Ret. Sys. of the City of Detroit v. UBS AG, No. 10-CV-13920, 2010 WL 5296957, at *4 (E.D. Mich. Dec. 20, 2010). Preston Byrd has admitted that he is a Tennessee citizen. (See Second Am. Compl. ¶ 3; Defs. Answer to Second Am. Compl. ¶ 3.) Therefore, the Byrd Trust is a Tennessee citizen. See May Dep't Stores Co., 305 F.3d at 599.

Because "no plaintiff and no defendant are citizens of the same state," diversity of citizenship exists. See Curry, 462 F.3d at 540. Arvest has met its burden of demonstrating by competent proof that the complete diversity requirement is met.[5] See Cleveland Hous. Renewal Project, 621 F.3d at 559.

---

[5] That Arvest Bank v. Sykes, No. 10-2007, now terminated, was once consolidated with this case does not matter. (Order Granting Mot. to Transfer and Consolidate, No. 10-2007, ECF No. 30.) "Case law has clearly established that actions consolidated pursuant to Rule 42(a) maintain a separate identity." Webb v. Just In Time, Inc., 769 F. Supp. 993, 996 (E.D. Mich. 1991) (citations omitted). "Thus, when determining whether diversity of citizenship exists, the claims must be addressed separately; consolidation 'does not merge the suits into a single cause, or change the rights of the parties, or make those who are parties in one suit parties in another.'" Id. (quoting Johnson v. Manhattan Ry. Co., 289 U.S. 479, 496-97 (1933)); accord First Nat'l Bank of Pulaski v. Curry, 301 F.3d 456, 467 (6th Cir. 2002); see also Aetna Cas. & Sur. Co. v. Anierco Concrete Co., 404 F.3d 566, 569 n.2 (2d

To defeat diversity jurisdiction for want of meeting the amount-in-controversy requirement, "[i]t must appear to a legal certainty that the claim is really for less than the jurisdictional amount." Charvat v. GVN Mich., Inc., 561 F.3d 623, 628 (6th Cir. 2009) (quoting St. Paul Mercury Indem. Co. v. Red Cab Co., 303 U.S. 283, 289 (1938)). "Generally, the amount claimed by the plaintiff in the complaint rules, as long as claimed in good faith, and '[e]vents occurring subsequent to the institution of suit which reduce the amount recoverable below the statutory limit do not oust jurisdiction.'" Id. (quoting St. Paul Mercury Indem. Co., 303 U.S. at 289-90).

Arvest demands compensatory and punitive damages from Defendants "in an amount not to exceed $15,000,000.00," as well as imposition of a constructive trust upon money, property, and proceeds allegedly converted by Defendants and held by Defendants or their agents. (See Second Am. Compl. 13.) It alleges that Preston Byrd converted a significant amount of funds received by Lessee for his personal use and benefit, transferring large sums of money, real estate, and vehicles to himself, Donette Byrd, and the Byrd Trust without sufficient consideration. (See id. ¶¶ 22-28.) As of September 24, 2009, Arvest, as the significant bondholder, was owed $8,802,439.55,

---

Cir. 2005) ("Although General is also a Pennsylvania corporation, consolidated cases do not lose their separate identity, and thus diversity is evaluated in terms of each individual case.") (citations omitted).

with daily interest of $1,404.18 accruing since that date. (See id. ¶ 31.) Under these circumstances, it does not appear to a legal certainty that Arvest's claim is for less than the jurisdictional amount. Far more than $75,000 is in controversy. Therefore, the amount-in-controversy requirement is satisfied. See 28 U.S.C. § 1332(a)(1); Charvat, 561 F.3d at 628.

Because Arvest has met its "burden of demonstrating by competent proof that the complete-diversity and amount-in-controversy requirements are met," this Court has diversity jurisdiction over Arvest's claims under 28 U.S.C. § 1332(a)(1). See 28 U.S.C. § 1332(a)(1); Cleveland Hous. Renewal Project, 621 F.3d at 559.

The Court has original jurisdiction over Preston Byrd's counterclaims against Arvest. For the reasons discussed above, the parties are completely diverse. Preston Byrd demands compensatory and punitive damages in an amount not less than $5,000,000, and an additional amount not less than $1,250,000 in compensatory and punitive damages for loss of income because of Arvest's alleged responsibility for the failure of the Lamar Crossing project's development. (See Def. Counter-Claim Against Arvest Bank 1-9.) Because it does not appear to a legal certainty that Preston Byrd's claims are for less than the jurisdictional amount, the amount-in-controversy requirement is satisfied. See 28 U.S.C. § 1332(a)(1); Charvat, 561 F.3d at

19

628.    Therefore, the Court has diversity jurisdiction over Preston Byrd's counterclaims under 28 U.S.C. § 1332(a)(1).   See 28 U.S.C. § 1332(a)(1); Cleveland Hous. Renewal Project, 621 F.3d at 559.   Even if it did not have diversity jurisdiction over Preston Byrd's counterclaims, it would exercise supplemental jurisdiction over his counterclaims because they "derive from a common nucleus of operative facts," forming part of the same case or controversy as Arvest's claims.   See Harper v. AutoAlliance Int'l, Inc., 392 F.3d 195, 209 (6th Cir. 2004); Quinn v. Pipe & Piling Supplies (U.S.A.) Ltd., No. 2:09-cv-161, 2011 WL 672240, at *1-2 (W.D. Mich. Feb. 18, 2011).

####    B.    Choice of Law

In a diversity action, state substantive law governs.   See Montgomery v. Wyeth, 580 F.3d 455, 459 (6th Cir. 2009) (citation omitted); Brocklehurst v. PPG Indus., Inc., 123 F.3d 890, 894 (6th Cir. 1997) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938)).   A federal district court must apply the choice-of-law rules of the state in which it sits.   See Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 496 (1941); Montgomery, 580 F.3d at 459 (citation omitted).

For tort claims, Tennessee follows the "most significant relationship" rule, which provides that "the law of the state where the injury occurred will be applied unless some other state has a more significant relationship to the litigation."

_Hataway v. McKinley_, 830 S.W.2d 53, 59 (Tenn. 1992). To determine which state has the "most significant relationship," Tennessee courts consider seven principles:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability, and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

_Timoshchuk v. Long of Chattanooga Mercedes-Benz_, No. E2008-01562-COA-R3-CV, 2009 WL 3230961, at *10 (Tenn. Ct. App. Oct. 8, 2009) (quoting _Restatement (Second) of Conflict of Laws_ § 6 (1971)). When applying those principles, courts must consider four factors: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, [and] (d) the place where the relationship, if any, between the parties is centered." _Id._ at *10-11 (quoting _Restatement (Second) of Conflict of Laws_ § 145 (1971)); _accord Hataway_, 830 S.W.2d at 59. "[T]hese contacts

are to be evaluated according to their relative importance with respect to the particular issue." Timoshchuk, 2009 WL 3230961, at *11; accord Hataway, 830 S.W.2d at 59.

Here, Arvest and Preston Byrd apparently agree that Tennessee law applies to Arvest's claims against Defendants. (See Pl. Arvest Bank's Mem. in Supp. of Mot. for Summ. J. Against Def. Preston E. Byrd for Conversion and Fraud in the Inducement, in Opp'n to Defs.' Mot. for Summ. J. and in Supp. of Mot. for Summ. J. on Def. Byrd's Countercl. 14-17, ECF No. 41-1 (arguing that Preston Byrd is liable for conversion and fraud in the inducement under Tennessee law) ("Arvest's Mem."); Byrd's Resp. 17-21 (citing Tennessee cases as support for the argument that Arvest cannot claim that Preston Byrd's conveyances were fraudulent); Defs. Preston E. Byrd and Donette L. Byrd's Mem. in Supp. of Their Second Mot. for Summ. J. Against Pl. Arvest Bank and in Opp'n to Arvest Bank's Mot. for Summ. J. Against Def. Preston E. Byrd for Conversion and Fraud in the Inducement 18-21, ECF No. 66-1 (citing Tennessee cases as support for the argument that Arvest cannot claim that Preston Byrd's conveyances were fraudulent) ("Byrds' Mem.").)

Although Arvest's principal place of business is in Arkansas, Arvest lent money through bonds issued by the Health, Educational and Housing Facility Board of the City of Memphis and allegedly suffered harm because of Preston Byrd's acts in

22

Tennessee through the Lamar Crossing project transaction. (See, e.g., Arvest's Statement of Facts ¶¶ 1-7, 13-14, 19, 22-27, 29, 31-34, 36-49.) Even if Arvest ultimately suffered financial harm in Arkansas, the conduct causing its injury occurred in Tennessee, the parties and entities did much of their business with Arvest in Tennessee, and the relationship between the parties and entities was centered in Tennessee. (See id.) Tennessee has a more significant relationship to the litigation. See Hataway, 830 S.W.2d at 59. No principle weighs against applying Tennessee law. See Timoshchuk, 2009 WL 3230961, at *10. Therefore, the Court will apply Tennessee law to Arvest's claims against Defendants. See Hataway, 830 S.W.2d at 59; Timoshchuk, 2009 WL 3230961, at *10; see also GBJ Corp. v. E. Ohio Paving Co., 139 F.3d 1080, 1085 (6th Cir. 1998); In re Korean Air Lines Disaster of Sept. 1, 1983, 932 F.2d 1475, 1495 (D.C. Cir. 1991).

Preston Byrd is a Tennessee citizen and allegedly suffered injury in Tennessee because of Arvest's role in causing the Lamar Crossing project's development to fail. (See Def. Counter-Claim Against Arvest Bank 1-9.) The conduct causing the injury was Arvest's alleged underfunding of the Lamar Crossing project in Tennessee, and the relationship between Preston Byrd and Arvest Bank was centered in Tennessee. (See id.) Tennessee has a more significant relationship to the litigation. See

23

Hataway, 830 S.W.2d at 59.  No principle weighs against applying Tennessee law.  See Timoshchuk, 2009 WL 3230961, at *10. Therefore, Tennessee law governs Preston Byrd's counterclaims against Arvest.  See Hataway, 830 S.W.2d at 59; Timoshchuk, 2009 WL 3230961, at *10.

## III. Standard of Review

Under Federal Rule of Civil Procedure 56, on motion of a party, the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party moving for summary judgment "bears the burden of clearly and convincingly establishing the nonexistence of any genuine [dispute] of material fact, and the evidence as well as all inferences drawn therefrom must be read in a light most favorable to the party opposing the motion." Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986).  The moving party can meet this burden by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his case.  See Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989).

When confronted with a properly supported motion for summary judgment, the respondent must set forth specific facts showing that there is a genuine dispute for trial.  See Fed. R.

Civ. P. 56.  A genuine dispute for trial exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  One may not oppose a properly supported summary judgment motion by mere reliance on the pleadings.  See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  Instead, the nonmovant must present "concrete evidence supporting [his] claims."  Cloverdale Equip. Co. v. Simon Aerials, Inc., 869 F.2d 934, 937 (6th Cir. 1989) (citations omitted); see Fed. R. Civ. P. 56(c)(1).  The district court does not have the duty to search the record for such evidence.  See Fed. R. Civ. P. 56(c)(3); InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989).  The nonmovant has the duty to point out specific evidence in the record that would be sufficient to justify a jury decision in his favor.  See Fed. R. Civ. P. 56(c)(1); InterRoyal Corp., 889 F.2d at 111. "Summary judgment is an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action[,] rather than a disfavored procedural shortcut."  FDIC v. Jeff Miller Stables, 573 F.3d

25

289, 294 (6th Cir. 2009) (internal quotation marks and citations omitted).

"Summary judgment in favor of the party with the burden of persuasion . . . is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." Hunt v. Cromartie, 526 U.S. 541, 553 (1999). "When the moving party does not have the burden of proof on the issue, he need show only that the opponent cannot sustain his burden at trial." Calderone v. United States, 799 F.2d 254, 259 (6th Cir. 1986) (quoting William W. Schwarzer, Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact, 99 F.R.D. 465, 487-88 (1984)). "But where the moving party has the burden—the plaintiff on a claim for relief or the defendant on an affirmative defense—his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." Id. (quoting Schwarzer, Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact, at 488) (emphasis in original); see also Shakur v. Schriro, 514 F.3d 878, 890 (9th Cir. 2008); Arnett v. Myers, 281 F.3d 552, 561 (6th Cir. 2002); Cockrel v. Shelby Cnty. Sch. Dist., 270 F.3d 1036, 1056 (6th Cir. 2001); cf. Timmer v. Mich. Dep't of Commerce, 104 F.3d 833, 843 (6th Cir. 1997) ("[I]f the moving party will bear the burden of persuasion at trial, then that party must support its motion

26

with credible evidence that would entitle it to a directed verdict if not controverted at trial.") (citation omitted); 11 James William Moore, <u>Moore's Federal Practice</u> § 56.13[1], at 56-162 (3d ed. 2010) ("[I]f the movant has the burden of persuasion on an issue, the movant must make a stronger claim to summary judgment by introducing supporting evidence that would conclusively establish movant's right to a judgment after trial should nonmovant fail to rebut the evidence.").

**IV.  Analysis**

Arvest has moved for summary judgment on its claims against Preston Byrd for conversion and fraud in the inducement.  (<u>See</u> Arvest's Mots. 1.)  Arvest has also moved for summary judgment on Preston Byrd's counterclaims.  (<u>See</u> <u>id.</u> at 1-2.)  Preston Byrd and Donette Byrd have moved for summary judgment on Arvest's claims.  (<u>See</u> Byrds' Mot. 1-2.)

> **A.  Arvest's Motion for Summary Judgment on Claims Against Preston Byrd for Conversion and Fraud in the Inducement**

Arvest argues that there is no genuine issue of material fact about whether Preston Byrd is liable for conversion and fraud in the inducement.  (<u>See</u> Arvest's Mots. 1.)  Preston Byrd disagrees, arguing that Arvest's claims for conversion and fraud in the inducement must fail.  (<u>See</u> Byrd's Resp. 17-26.)

> **1.  Arvest's Conversion Claim**

"Conversion is an intentional tort." Greenbank v. Thompson, No. E2010-00160-COA-R3-CV, 2010 WL 5549231, at *3 (Tenn. Ct. App. Dec. 29, 2010); see also Thompson v. Thompson, No. W2008-00489-COA-R3-CV, 2009 WL 637289, at *14 (Tenn. Ct. App. Mar. 12, 2009) ("To constitute conversion, the defendant must intend to convert the plaintiff's property." (citing Gen. Electric Credit Corp. of Tenn. v. Kelly & Dearing Aviation, 765 S.W.2d 750, 753 (Tenn. Ct. App. 1988))). "To prove conversion, a plaintiff must show the following: (1) the appropriation of another's property to one's own use and benefit, (2) by the intentional exercise of dominion over it, (3) in defiance of the true owner's rights." Greenbank, 2010 WL 5549231, at *3 (citing H&M Enters., Inc. v. Murray, No. M1999-02073-COA-R3-CV, 2002 WL 598556, at *3 (Tenn. Ct. App. Apr. 17, 2002); accord Thompson, 2009 WL 637289, at *14. The intention necessary to establish conversion "does not necessarily have to be a matter of conscious wrongdoing, but can merely be an exercise of dominion or control over the property in such a way that would be inconsistent with the owner's rights and which results in injury to him." Thompson, 2009 WL 637289, at *14 (quoting Gen. Electric Credit Corp. of Tenn., 765 S.W.2d at 753). "In other words, 'the defendant need only have an intent to exercise dominion and control over the property that is in fact inconsistent with the plaintiff's rights, and do so; good faith

28

is generally immaterial.'" <u>Id.</u> (quoting <u>Mammoth Cave Prod.</u> <u>Credit Ass'n v. Oldham</u>, 569 S.W.2d 833, 836 (Tenn. Ct. App. 1977)). "It is the degree of interference with the property, as well as the duration of that interference, that will be determinative of whether there has been conversion." <u>Id.</u> (citing <u>Gen. Electric Credit Corp. of Tenn.</u>, 765 S.W.2d at 753-54).

Arvest argues that Preston Byrd converted its money by transferring money Lessee erroneously received from trustee BNYM to Horizon Holding and then to himself and Donette Byrd. (<u>See</u> Arvest's Mem. 15; <u>see also</u> Arvest's Statement of Facts ¶¶ 23-24 (stating that "[f]rom September 2007 to May 2008, Byrd transferred and diverted $1,280,000 in proceeds received from Requisitions No. 2, 3 and 5-10 from Lessee to a bank account of Horizon Holding with Bank of America, which bank account Byrd controlled" and that "$1,187,275.33 in project requisition expenses were left unpaid, which is approximately the amount of construction proceeds ($1,280,000) that Byrd diverted from Lessee to Horizon Holding").)

Arvest has offered sufficient evidence supporting its account for a reasonable jury to conclude that Preston Byrd converted Arvest's money for his own use and benefit by intentionally exercising dominion over that money in defiance of Arvest's rights. (<u>See</u> Arvest's Statement of Facts ¶¶ 20-27, 29,

33, 36, 42, 49.)   A reasonable jury could conclude that Preston
Byrd is liable for conversion.   See Greenbank, 2010 WL 5549231,
at *3; Thompson, 2009 WL 637289, at *14.

Preston Byrd has offered an affidavit in which he denies
Arvest's account:

> Arvest alleges that Byrd transferred and diverted
> $1,280,000 in proceeds received from Requisitions No.
> 2, 3 and 5-10 from Lessee to a bank account of
> [Horizon Holding] with Bank of America, which bank
> account Byrd controlled. However, [Lamar Crossing
> Development, LLC] was a vender to [Lamar Crossing
> Apartments, LP] and [Horizon Holding] was the sole
> owner of [Lamar Crossing Development, LLC]. [Lamar
> Crossing Development, LLC] was contracted by [Lamar
> Crossing Apartments, LP] to perform development
> services for a fee in the amount of $1,365,000. <u>Any
> fees that were received by [Horizon Holding] from
> [Lamar Crossing Apartments, LP], in which Byrd denies
> that funds in the amount of $1,280,000 were received
> by [Horizon Holding], were for services rendered under
> the terms of the Development Agreement.</u>

(Aff. of Preston E. Byrd ¶ 38, ECF No. 59-1 (emphasis added).)

Viewing Preston Byrd's affidavit in a light most favorable
to him, as the Court must because he opposes Arvest's summary
judgment motion, see Kochins, 799 F.2d at 1133, Preston Byrd
denies that Horizon Holding received the money that Arvest
argues he converted and that Arvest had a right to any money
transferred to Horizon Holding. (See Aff. of Preston E. Byrd ¶
38.) By doing so, he raises a genuine dispute for trial about a
link in the chain of evidence Arvest presents to argue that he
converted its money. See Anderson, 477 U.S. at 255

("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict."); Keweenaw Bay Indian Cmty. v. Rising, 477 F.3d 881, 886 (6th Cir. 2007) ("Weighing of the evidence or making credibility determinations are prohibited at summary judgment—rather, all facts must be viewed in the light most favorable to the non-moving party.") (citation omitted).

If a jury believes Preston Byrd's account, it could reasonably reject Arvest's chain of evidence offered to show Preston Byrd converted its money.  Because Arvest has offered no other account to show how Preston Byrd allegedly converted its money, a reasonable jury could conclude that Preston Byrd is not liable for conversion.  See Greenbank, 2010 WL 5549231, at *3; Thompson, 2009 WL 637289, at *14.  There are genuine disputes as to material facts.  Arvest has not demonstrated "that no reasonable trier of fact could find other than for the moving party."  See Calderone, 799 F.2d at 259.  Therefore, Arvest is not entitled to summary judgment on its conversion claim against Preston Byrd.  See Anderson, 477 U.S. at 255; Keweenaw Bay Indian Cmty., 477 F.3d at 886; Calderone, 799 F.2d at 259. Arvest's motion for summary judgment on that claim is DENIED.

**2.  Arvest's Fraud in the Inducement Claim**

31

Under Tennessee law, a plaintiff must prove five elements to sustain a claim of fraud in the inducement of a contract:

> (1) [the existence of] a false statement concerning a fact material to the transaction; (2) knowledge of the statement's falsity or utter disregard for its truth; (3) intent to induce reliance on the statement; (4) reliance under circumstances manifesting a reasonable right to rely on the statement; (5) an injury resulting from the reliance.

Blackburn & McCune, PLLC v. Pre-Paid Legal Servs., Inc., No. M2009-01584-COA-R3-CV, 2010 WL 2670816, at *11 (Tenn. Ct. App. June 30, 2010) (quoting Lamb v. MegaFlight, Inc., 26 S.W.3d 627, 630 (Tenn. Ct. App. 2000)).

Here, Arvest argues that Preston Byrd misrepresented to Arvest that Sykes and Hutton were Horizon Holding's sole members and owners, concealing that Donette Byrd owned a majority interest through Horizon Financial. (See Arvest's Mem. 16.) According to Arvest, Preston Byrd knew that Arvest would not have participated in the Lamar Crossing project transaction if it had known of his wife's majority interest because of his recent felony conviction for wire fraud. (See id.) The alleged purpose of Preston Byrd's misrepresentations about Horizon Holding's members and owners was to induce Arvest to agree to participate in, finance, and purchase the bonds for the Lamar Crossing project transaction, which resulted in Arvest's losing millions of dollars. (See id. at 16-17.)

32

Arvest has offered sufficient evidence supporting that account that a reasonable jury could conclude that Preston Byrd knowingly misrepresented Horizon Holding's members and owners to induce Arvest to participate in the Lamar Crossing project transaction, that Arvest reasonably relied on Preston Byrd's representations, and that Arvest suffered harm because of its reliance. (See Arvest's Statement of Facts ¶¶ 1-7, 13-14, 37-42, 47, 49.) A reasonable jury could conclude that Preston Byrd is liable for fraud in the inducement of a contract. See Blackburn & McCune, PLLC, 2010 WL 2670816, at *11.

The evidence Arvest presents could persuade a reasonable jury to rule in its favor, but is not so overwhelming that a reasonable jury could reach only one conclusion about Preston Byrd's intentions in allegedly misrepresenting Horizon Holding's members and owners. Arvest has presented evidence that Preston Byrd made false statements material to the transaction about Horizon Holding's members and owners with knowledge that the statements were false. (See, e.g., Arvest's Statement of Facts ¶¶ 3, 6-7, 37-40.) Arvest has also presented evidence that it reasonably relied on Preston Byrd's statements, causing it to suffer injury. (See, e.g., id. ¶¶ 3-5, 14, 40-41, 47, 49.) Based on that evidence and the additional evidence of Preston Byrd's allegedly converting money made available because of the Lamar Crossing project transaction, a reasonable jury could

33

conclude that Preston Byrd intended to induce reliance on his statements.  (<u>See, e.g.</u>, <u>id.</u> ¶¶ 1-7, 13-14, 20-27, 37-42, 47, 49.)

Although Arvest's evidence <u>could</u> persuade a reasonable jury to find in its favor, it has not offered evidence of Preston Byrd's state of mind that is so powerful that a reasonable jury <u>could only</u> conclude that Preston Byrd intended to induce reliance on his statements.  Because Arvest must prove Preston Byrd intended to induce reliance on his statements to prove fraud in the inducement of a contract, a reasonable trier of fact could conclude that Preston Byrd is not liable.  <u>See</u> <u>Blackburn & McCune, PLLC</u>, 2010 WL 2670816, at *11.  As the plaintiff, Arvest must demonstrate that "no reasonable trier of fact could find other than for the moving party" to be entitled to summary judgment in its favor on its claim for fraud in the inducement.  <u>See</u> <u>Calderone</u>, 799 F.2d at 259.  It has not done so.  Because Arvest has not introduced sufficient evidence to make that showing, it is not entitled to summary judgment on that claim.  <u>See</u> <u>id.</u>; <u>see also</u> <u>Shakur</u>, 514 F.3d at 890; <u>Arnett</u>, 281 F.3d at 561; <u>Cockrel</u>, 270 F.3d at 1056.

Summary judgment would also be inappropriate because Preston Byrd has offered sufficient evidence to create a genuine dispute for trial.  He has offered an affidavit in which he states that, although Arvest performed a background

34

investigation on him and discovered his felony conviction before proceeding with the Lamar Crossing project transaction, Arvest agreed to proceed with the transaction without his or his wife's guaranteeing Arvest's loan. (See Aff. of Preston E. Byrd ¶ 11, ECF No. 59-1 ("After a background check was performed on Byrd by Arvest per the Business Identification Notice that Byrd submitted to Arvest, Arvest discovered that Byrd had a felony conviction. Byrd discussed this issue with Clarence Beatty ("Beatty") of Arvest and Arvest agreed to proceed with the loan under the structure of Sykes, Hutton and [Horizon Holding] only serving as guarantors to the loan.").) He also swears:

> Arvest was fully aware of Byrd's involvement and his role in the Lamar Crossing project. It was never hidden to Arvest that Byrd served as the Chief Manager to [Horizon Holding] and that Byrd would be executing all of the documents related to Lamar Crossing on [] behalf of [Horizon Holding] as its Chief Manager. It was also never hidden to Arvest that Byrd was very active and played a major role in pulling the Lamar Crossing transaction together. Arvest has admitted that it was aware of Byrd's involvement in the project and that Byrd [] executed several project related documents as the Chief Manager of [Horizon Holding].
>
> Arvest was fully aware of Byrd's felony conviction because Arvest preformed [sic] a background check on Byrd after Byrd submitted the Business Identification Notice to Arvest and after a verbal discussion that Byrd had with Beatty however, Arvest chose to continue with the [commencement] of the loan for [Lamar Crossing Apartments, LP] in spite of Byrd's previous history.

(Id. ¶¶ 12-13 (emphasis added).)

Viewing Preston Byrd's affidavit in a light most favorable to him, he asserts that Arvest knew of his felony conviction and knew he would be executing all documents on behalf of Horizon Holding, but decided to proceed with the transaction. (See id. ¶¶ 11-13.) Arvest argues that its fraud in the inducement claim "is not based on background checks or knowledge (or lack thereof) of Byrd's criminal record." (Arvest's Reply 8.) However, Arvest asserts in its Statement of Facts that, if it had known Horizon Holding's true members and owners, it would have investigated Preston Byrd and Donette Byrd's backgrounds "and upon discovery of Byrd's felony conviction for wire fraud would have not gone forward with the transaction." (Arvest's Statement of Facts ¶ 41.)

Because Arvest's position is that it would not have proceeded with the transaction if it had known of Preston Byrd's felony conviction and Preston Byrd has offered evidence that Arvest knew of his conviction, a genuine dispute for trial exists about Preston Byrd's intent in making statements of fact. If Arvest already knew of Preston Byrd's conviction, a reasonable trier of fact could conclude that Preston Byrd did not misrepresent Horizon Holding's members and owners to induce Arvest to participate in the transaction by hiding that fact, contrary to Arvest's account. By drawing that conclusion, a reasonable trier of fact could conclude that Preston Byrd is not

36

liable.  See Blackburn & McCune, PLLC, 2010 WL 2670816, at *11.
Because there is a genuine dispute about a material fact and
Arvest has not demonstrated that a reasonable trier of fact
could only find in its favor, it is not entitled to summary
judgment on its fraud in the inducement claim against Preston
Byrd.  See Anderson, 477 U.S. at 255; Keweenaw Bay Indian Cmty.,
477 F.3d at 886; Calderone, 799 F.2d at 259.  Arvest's motion
for summary judgment on that claim is DENIED.

### B.  Arvest's Motion for Summary Judgment on Preston Byrd's Counterclaims

Preston Byrd has filed counterclaims against Arvest "for
negligence, tort, libel, slander, irreparable injury,
compensatory damages, and punitive damages." (Def. Counter-
Claim Against Arvest Bank 1.)  Because Preston Byrd has cited no
authority that "tort," irreparable injury, compensatory damages
and punitive damages are separate causes of action in Tennessee
and the Court is unable to find any, the Court construes Preston
Byrd's filing as asserting counterclaims for three torts: (1)
negligence, (2) libel, and (3) slander.  (See id. at 1-9.)
Arvest argues that it is entitled to summary judgment on Preston
Byrd's counterclaims.  (See Arvest's Mem. 18-20.)

### 1.  Preston Byrd's Negligence Claim

Under Tennessee law, a plaintiff must establish five
elements to prevail on a negligence claim:

> (1) a duty of care owed by the defendant to the
> plaintiff; (2) conduct by the defendant falling below
> the applicable standard of care that amounts to a
> breach of that duty; (3) an injury or loss; (4)
> causation in fact; and (5) proximate, or legal,
> causation.

Staples v. CBL & Assocs., Inc., 15 S.W.3d 83, 89 (Tenn. 2000)
(citations omitted); accord Rice v. Sabir, 979 S.W.2d 305, 308
(Tenn. 1998). "The first element, that of duty . . . is the
legal obligation of a defendant to conform to a reasonable
person's standard of care in order to protect against
unreasonable risks of harm." Giggers v. Memphis Hous. Auth.,
277 S.W.3d 359, 364 (Tenn. 2009) (citations omitted). "In
general, an individual has a duty to others to refrain from
engaging in misfeasance, affirmative acts that a reasonable
person 'should recognize as involving an unreasonable risk of
causing an invasion of an interest of another' or acts 'which
involve[] an unreasonable risk of harm to another.'" Id.
(quoting Restatement (Second) of Torts §§ 284, 302 (1965))
(alterations in original).

"In order to determine whether a duty is owed in a
particular circumstance, courts must first establish that the
risk is foreseeable, and, if so, must then apply a balancing
test based upon principles of fairness to identify whether the
risk was unreasonable." Id. at 365 (citation omitted). "That
is, in consideration of, among other things, the presence or

absence of prior similar incidents, and other circumstances, does the foreseeability of the harm outweigh the burden of the duty imposed?"   Id. (citation omitted); see also Biscan v. Brown, 160 S.W.3d 462, 478 (Tenn. 2005) ("We determine whether a duty existed in a particular case by evaluating the risk involved. 'A risk is unreasonable and gives rise to a duty to act with due care if the foreseeable probability and gravity of harm posed by defendant's conduct outweigh the burden upon defendant to engage in alternative conduct that would have prevented the harm.'" (quoting McCall v. Wilder, 913 S.W.2d 150, 153 (Tenn. 1995))).

The basis for Preston Byrd's negligence claim is that Arvest allegedly had a duty to provide sufficient money for the Lamar Crossing project to be completed and breached that duty by underfunding the project and approving certain expenses. (See Def. Counter-Claim Against Arvest Bank 1-2, 8.) Preston Byrd offers no evidence that Arvest assumed a duty of reasonable care to him individually, as he was not a party to the Lamar Crossing project transaction. He also offers no evidence that Arvest assumed a duty in tort to pay for all costs associated with the project. To the contrary, Arvest required individual guarantees from Horizon Holding's members and owners to proceed with the transaction, and Sykes and Hutton guaranteed that they would pay

all costs required to complete the Lamar Crossing project development. (<u>See</u> Arvest's Statement of Facts ¶¶ 9-10.)

Because Preston Byrd has offered no evidence that it was foreseeable to Arvest that its alleged underfunding could cause the Lamar Crossing project to fail given Sykes' and Hutton's individual guarantees or that it was foreseeable that the project's failure could harm Preston Byrd, the risk of injury to Preston Byrd was not generally foreseeable. As "no duty will arise when a risk of injury is not generally foreseeable," <u>Giggers</u>, 277 S.W.3d at 365, Arvest had no duty to Preston Byrd and Preston Byrd cannot recover on his negligence claim. <u>See</u> <u>Staples</u>, 15 S.W.3d at 89. A reasonable jury could not find in Preston Byrd's favor because he has offered no evidence sufficient for a reasonable jury to conclude that Arvest breached any duty by underfunding the project and approving certain expenses. <u>See</u> <u>id.</u> There is no genuine issue as to any material fact, and Arvest is entitled to judgment as a matter of law. Arvest is entitled to summary judgment on Preston Byrd's negligence claim. <u>See</u> <u>Binay v. Bettendorf</u>, 601 F.3d 640, 646 (6th Cir. 2010). Arvest's motion for summary judgment on that claim is GRANTED.

### 2. Preston Byrd's Libel and Slander Claims

Under Tennessee law, "[l]ibel and slander are both forms of defamation." <u>Kersey v. Wilson</u>, No. M2005-02106-COA-R3-CV, 2006

40

WL 3952899, at *3 (Tenn. Ct. App. Dec. 29, 2006); accord Hibdon
v. Grabowski, 195 S.W.3d 48, 58 (Tenn. Ct. App. 2005) (citing
Quality Auto Parts Co. v. Bluff City Buick Co., 876 S.W.2d 818,
820 (Tenn. 1994)); see also Milligan v. United States, 644 F.
Supp. 2d 1020, 1033 (M.D. Tenn. 2009) ("Under Tennessee law,
both libel and slander are forms of the tort of defamation."
(citing Quality Auto Parts Co., 876 S.W.2d at 820)).  "Libel is
written defamation and slander is spoken defamation."  Kersey,
2006 WL 3952899, at *3 (citing Quality Auto Parts Co., 876
S.W.2d at 820).

        "The basis for an action for defamation, whether it be
slander or libel, is that the defamation has resulted in an
injury to the person's character and reputation."  Id. (quoting
Davis v. The Tennesseean, 83 S.W.3d 125, 128 (Tenn. Ct. App.
2001)).   To establish a prima facie case of defamation, a
plaintiff must establish that (1) "a party published a
statement"; (2) "with knowledge that the statement is false and
defaming to the other"; or (3) "with reckless disregard for the
truth of the statement or with negligence in failing to
ascertain the truth of the statement."  Sullivan v. Baptist
Mem'l Hosp., 995 S.W.2d 569, 571 (Tenn. 1999) (citations
omitted); accord Clark v. Hoops, LP, 709 F. Supp. 2d 657, 671
(W.D. Tenn. 2010); Hibdon, 195 S.W.3d at 58.

Preston Byrd has offered no admissible evidence that could persuade a reasonable jury to conclude that Arvest knowingly published a false, defamatory statement about him. He has also offered no admissible evidence that Arvest made a statement about him with reckless disregard for the statement's truth or with negligence in failing to ascertain the statement's truth. A reasonable jury could not conclude that Arvest is liable for defamation. See Sullivan, 995 S.W.2d at 571. There is no genuine issue as to any material fact, and Arvest is entitled to judgment as a matter of law. Therefore, Arvest is entitled to summary judgment on Preston Byrd's libel and slander claims. See Binay, 601 F.3d at 646. Arvest's motion for summary judgment on those claims is GRANTED.

### C. Preston Byrd and Donette Byrd's Motion for Summary Judgment on Arvest's Claims

Arvest claims that Defendants are liable for (1) conversion, (2) money had and received, unjust enrichment, and restitution, (3) fraud, (4) fraudulent conveyance,[6] and (5) common law fraud in the inducement and intentional misrepresentation.[7] (See Second Am. Compl. ¶¶ 34-45, 49-73.)

---

[6] As discussed in footnote 2, Arvest's fraudulent conveyance count appears to be directed against Preston Byrd, not Donette Byrd or the Byrd Trust. (See Second Am. Compl. ¶¶ 49-55.)

[7] Arvest requests that the Court impose a constructive trust in a separate count. (See Second Am. Compl. ¶¶ 46-48.) "A constructive trust is a remedy, not an independent cause of action." Boynton v. Headwaters, Inc., No. 1:02-cv-01111-JPM-egb, 2011 WL 1361549, at *4 n.5 (W.D. Tenn. Apr. 11, 2011) (citations omitted); see also Thompson v. Am. Gen. Life & Accident Ins. Co., 404 F. Supp. 2d 1023, 1029 n.2 (M.D. Tenn. 2005) ("The Court finds that

Preston Byrd and Donette Byrd argue that they are entitled to summary judgment on Arvest's claims. (<u>See</u> Byrds' Mot. 1-2.) Arvest disagrees. (<u>See</u> Arvest's Resp. 1-2.)

### 1.   Arvest's Conversion Claim

"To prove conversion, a plaintiff must show the following: (1) the appropriation of another's property to one's own use and benefit, (2) by the intentional exercise of dominion over it, (3) in defiance of the true owner's rights." <u>Greenbank</u>, 2010 WL 5549231, at *3.

As discussed above, Arvest has offered sufficient evidence for a reasonable jury to conclude that Preston Byrd converted Arvest's money for his own use and benefit by intentionally exercising dominion over the money in defiance of Arvest's rights. (<u>See</u> Arvest's Statement of Facts ¶¶ 20-27, 29, 33, 36, 42, 49.) A reasonable jury could conclude that Preston Byrd is liable for conversion. <u>See</u> <u>Greenbank</u>, 2010 WL 5549231, at *3; <u>Thompson</u>, 2009 WL 637289, at *14.

Arvest has also offered sufficient evidence for a reasonable jury to conclude that Donette Byrd received and assumed control over real estate and property that Arvest's funds were used to purchase and that she did so for her own use

---

'constructive trust' is not a cause of action, but rather a remedy used by courts to enforce substantive rights.") (citation omitted). Arvest's request for a constructive trust is not a separate cause of action that the Court need analyze in deciding Preston Byrd and Donette Byrd's summary judgment motion.

and benefit with knowledge that she had no right to the real estate or the property. (See Arvest's Statement of Facts ¶¶ 20-25, 36-42.) A reasonable jury could conclude that Donette Byrd is liable for conversion. See Greenbank, 2010 WL 5549231, at *3; Thompson, 2009 WL 637289, at *14. There are genuine issues as to material facts. Preston Byrd and Donette Byrd have not demonstrated that they are entitled to judgment as a matter of law on Arvest's conversion claim. Therefore, their motion for summary judgment on that claim is DENIED. See Keweenaw Bay Indian Cmty., 477 F.3d at 886.

### 2. Arvest's Money Had and Received, Unjust Enrichment, and Restitution Claims

"Both unjust enrichment and money had and received are essentially the same cause of action, being both quasi-contractual actions." Bennett v. Visa U.S.A. Inc., 198 S.W.3d 747, 755 (Tenn. Ct. App. 2006). "The elements of an unjust enrichment claim are: 1) '[a] benefit conferred upon the defendant by the plaintiff'; 2) 'appreciation by the defendant of such benefit'; and 3) 'acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof.'" Freeman Indus., LLC v. Eastman Chem. Co., 172 S.W.3d 512, 525 (Tenn. 2005) (quoting Paschall's, Inc. v. Dozier, 407 S.W.2d 150, 155 (Tenn. 1966)); accord Hood Land Trust v. Hastings, No. M2009-02625-COA-

R3-CV, 2010 WL 3928647, at *6 (Tenn. Ct. App. Oct. 5, 2010). "The remedy for unjust enrichment requires that the person who has been unjustly enriched at the expense of another make restitution to that person." Chase Manhattan Bank, N.A. v. CVE, Inc., 206 F. Supp. 2d 900, 909 (M.D. Tenn. 2002) (citing Browder v. Hite, 602 S.W.2d 489, 491 (Tenn. Ct. App. 1980)).

Arvest has offered evidence that Preston Byrd and Donette Byrd received money from Arvest and kept the money for themselves rather than using it for the development of the Lamar Crossing project against Arvest's will, causing Arvest to suffer significant losses. (See Arvest's Statement of Facts ¶¶ 20-27, 29, 33, 36, 42, 47-49.) A reasonable jury could conclude that Preston Byrd and Donette Byrd are liable to Arvest for unjust enrichment and money had and received and must make restitution to Arvest. See Freeman Indus., LLC, 172 S.W.3d at 525; Bennett, 198 S.W.3d at 755.

There are genuine issues as to material facts. Preston Byrd and Donette Byrd have not demonstrated that they are entitled to judgment as a matter of law on Arvest's claim for money had and received, unjust enrichment, and restitution. Therefore, their motion for summary judgment on those claims is DENIED. See Keweenaw Bay Indian Cmty., 477 F.3d at 886.

### 3. Arvest's Fraud Claim

45

Under Tennessee law, a plaintiff must establish four elements to prove fraud:

> (1) an intentional misrepresentation with regard to a material fact; (2) knowledge of the representation's falsity (i.e., it was made "knowingly" or "without belief in its truth," or "recklessly" without regard to its truth or falsity); (3) the plaintiff reasonably relied on the misrepresentation and suffered damage; and (4) the misrepresentation relates to an existing or past fact, or, if the claim is based on promissory fraud, the misrepresentation "must embody a promise of future action without the present intention to carry out the promise."

McMillin v. Lincoln Mem'l Univ., No. E2010-01190-COA-R3-CV, 2011 WL 1662544, at *5 (Tenn. Ct. App. May 3, 2011) (quoting Shahrdar v. Global Hous., Inc., 983 S.W.2d 230, 237 (Tenn. Ct. App. 1998)); accord Carter v. Patrick, 163 S.W.3d 69, 77 (Tenn. Ct. App. 2004) (citing Stacks v. Saunders, 812 S.W.2d 587, 592 (Tenn. Ct. App. 1990)).

Arvest has offered evidence that Preston Byrd misrepresented Horizon Holding's true members and owners to induce Arvest to participate in the Lamar Crossing project transaction.[8] (See Arvest's Statement of Facts ¶¶ 1-7, 13-14, 37-42, 47, 49.) A reasonable jury could conclude that Preston Byrd is liable for fraud. See McMillin, 2011 WL 1662544, at *5. By drawing that conclusion, a reasonable jury could also

---

[8] In the Second Amended Complaint, Arvest seems to assert that Donette Byrd is liable for fraud. (See Second Am. Compl. ¶ 45 ("In reliance on Byrd's misrepresentations, Arvest took the aforementioned actions to its detriment and Defendants are liable to Arvest for damages, both compensatory and punitive.").)

conclude that Donette Byrd is liable for fraud because she accepted and retained the benefits of Preston Byrd's fraud knowing that those benefits were obtained through fraud. <u>See</u> <u>Dodson v. Anderson</u>, 710 S.W.2d 510, 512 (Tenn. 1986) ("We are of the opinion that the marital relationship alone does not render one spouse liable for the fraudulent actions of the other. A spouse may, however, ratify the fraudulent act of the other so as to become liable for the fraud itself by accepting or retaining the benefits of the act knowing it was tainted with fraud."); <u>see also</u> <u>Edwards v. Bruce</u>, No. 01A01-9510-CH-00458, 1996 WL 383294, at *10 (Tenn. Ct. App. July 10, 1996).

There are genuine issues as to material facts. Preston Byrd and Donette Byrd have not demonstrated that they are entitled to judgment as a matter of law on Arvest's claim of fraud. Therefore, their motion for summary judgment on that claim is DENIED. <u>See</u> <u>Keweenaw Bay Indian Cmty.</u>, 477 F.3d at 886.

### 4. Arvest's Fraudulent Conveyance Claim

Under Tennessee law, "[a] conveyance can be set aside as fraudulent if it is made without a fair consideration leaving the grantor insolvent, or if it is made with the actual intent to hinder, delay, or defraud creditors." <u>In re Estate of</u> <u>Reynolds</u>, No. W2006-01076-COA-R3-CV, 2007 WL 2597623, at *11 (Tenn. Ct. App. Sept. 11, 2007) (citation omitted); <u>see</u> <u>Stone v.</u>

Smile, No. E2009-00047-COA-R3-CV, 2009 WL 4893563, at *5-6 (Tenn. Ct. App. Dec. 18, 2009).

"Because fraudulent transferors rarely disclose their intent in a way that is capable of direct evidence, persons seeking to set aside fraudulent transfers must frequently resort to circumstantial evidence." In re Estate of Reynolds, 2007 WL 2597623, at *11 (quoting Bell v. Goforth, No. M2004-00997-COA-R3-CV, 2006 WL 627189, at *4 (Tenn. Ct. App. Mar. 14, 2006)). "The circumstances that permit the trier-of-fact to conclude that a particular transfer was fraudulent are commonly referred to as 'badges of fraud.'" Bell, 2006 WL 627189, at *4. Courts in Tennessee have found the following characteristics of transactions to be badges of fraud:

1. The transferor is in a precarious financial condition.

2. The transferor knew there was or soon would be a large money judgment rendered against the transferor.

3. Inadequate consideration was given for the transfer.

4. Secrecy or haste existed in carrying out the transfer.

5. A family or friendship relationship existed between the transferor and the transferee(s).

6. The transfer included all or substantially all of the transferor's nonexempt property.

7. The transferor retained a life estate or other interest in the property transferred.

48

8. The transferor failed to produce available evidence explaining or rebutting a suspicious transaction.

9. There is a lack of innocent purpose or use for the transfer.

Stone, 2009 WL 4893563, at *5 (quoting Nadler v. Mountain Valley Chapel Bus. Trust, No. E2003-00848-COA-R3-CV, 2004 WL 1488544, at *2 (Tenn. Ct. App. June 30, 2004)). "The presence of one or more of the badges of fraud gives rise to a presumption of fraud and shifts the burden of disproving fraud to the defendant." Id. (citations omitted).

Here, Arvest has offered evidence that Preston Byrd transferred money from Lessee to Horizon Holding and from Horizon Holding to himself, Donette Byrd, and the Byrd Trust. (See, e.g., Arvest's Statement of Facts ¶¶ 20-27, 29, 42.) For example, Preston Byrd transferred three automobiles to Donette Byrd for no consideration fifteen days before general contractor Patton Taylor stopped work on the Lamar Crossing project for nonpayment. (See id. ¶ 42.) Preston Byrd also transferred Horizon Holding's real estate to the Byrd Trust for no consideration although, less than one and one-half years later, the real estate had a stated value of $472,000. (See id.)

Under these circumstances, Arvest has raised genuine issues of material fact about whether Preston Byrd's conveyances were fraudulent. See Stone, 2009 WL 4893563, at *5-6. Preston Byrd and Donette Byrd have not shown that they are entitled to

49

judgment as a matter of law on Arvest's fraudulent conveyance claim.    Therefore, their motion for summary judgment on that claim is DENIED.    See Keweenaw Bay Indian Cmty., 477 F.3d at 886.

### 5.    Arvest's Common Law Fraud in the Inducement and Intentional Misrepresentation Claims

Under Tennessee law, a plaintiff must prove five elements to sustain a claim of fraud in the inducement of a contract:

> (1) [the existence of] a false statement concerning a fact material to the transaction; (2) knowledge of the statement's falsity or utter disregard for its truth; (3) intent to induce reliance on the statement; (4) reliance under circumstances manifesting a reasonable right to rely on the statement; (5) an injury resulting from the reliance.

Blackburn & McCune, PLLC, 2010 WL 2670816, at *11 (quoting Lamb, 26 S.W.3d at 630).

As discussed above, Arvest has offered sufficient evidence for a reasonable jury to conclude that Preston Byrd knowingly misrepresented Horizon Holding's members and owners to induce Arvest to participate in the Lamar Crossing project transaction, that Arvest reasonably relied on Preston Byrd's representations, and that Arvest suffered harm because of its reliance.    (See Arvest's Statement of Facts ¶¶ 1-7, 13-14, 37-42, 47, 49.)    A reasonable jury could conclude that Preston Byrd is liable for fraud in the inducement of a contract.    See Blackburn & McCune, PLLC, 2010 WL 2670816, at *11.    A reasonable jury could also

conclude that Donette Byrd is also liable because she accepted and retained the benefits of Preston Byrd's fraud knowing that those benefits were obtained through fraud.   See Dodson, 710 S.W.2d at 512; see also Edwards, 1996 WL 383294, at *10.

There are genuine issues as to material facts.   Preston Byrd and Donette Byrd have not demonstrated that they are entitled to judgment as a matter of law on Arvest's fraud in the inducement claim.   Therefore, their motion for summary judgment on that claim is DENIED.[9]   See Keweenaw Bay Indian Cmty., 477 F.3d at 886.[10]

### V. Conclusion

For the foregoing reasons, Arvest's motion for summary judgment against Preston Byrd for conversion and fraud in the inducement is DENIED.   Arvest's motion for summary judgment on Preston Byrd's counterclaims is GRANTED.   Preston Byrd and Donette Byrd's motion for summary judgment is DENIED.

So ordered this 26th day of August, 2011.

---

[9] "[T]here is not a separate cause of action for intentional misrepresentation in Tennessee." Soles4Souls, Inc. v. Donelson Cedarstone Assocs., LP, No. M2009-01906-COA-R3-CV, 2010 WL 5289959, at *3 n.5 (Tenn. Ct. App. Dec. 17, 2010) (citation omitted).   "Rather, intentional misrepresentation is an element of fraud." Id. (citation omitted).   Therefore, the Court need not analyze Arvest's intentional misrepresentation claim asserted in Count VI apart from its analysis of Arvest's fraud claim.
[10] In light of the foregoing discussion, Preston Byrd and Donette Byrd's remaining arguments about why they are entitled to summary judgment are not well-taken. (See Byrds' Mem. 18-37.)

s/ Samuel H. Mays, Jr.
SAMUEL H. MAYS, JR.
UNITED STATES DISTRICT JUDGE